IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
COOKEVILLE DIVISION

ARLIE RAY THOMAS,                          )
                                           )
      Petitioner,                     )
                                           )
v.                                         )    Case No. 2:11-cv-00081
                                           )
BRUCE WESTBROOKS, Warden,[1]               )    Judge Sharp
                                           )
      Respondent.                     )

<u>MEMORANDUM OPINION</u>

      Petitioner Arlie Ray Thomas was convicted and sentenced by the Criminal Court for Putnam County in Cookeville, Tennessee after a jury trial, and is presently an inmate at the Southeastern Tennessee State Regional Correctional Facility in Pikeville, Bledsoe County, Tennessee. Now before the Court is his petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. (ECF No. 1.)

## I.      BACKGROUND and PROCEDURAL HISTORY

      On April 1, 2004, petitioner Arlie Ray Thomas was convicted of first degree murder by a jury in the Criminal Court for Putnam County, Tennessee; he was sentenced to life in prison with the possibility of parole. He was denied relief on direct appeal. *State v. Thomas*, No. M2004-01538-CCA-R3-CD, 2006 WL 1446842 (Tenn. Ct. Crim. App. May 22, 2006). The Tennessee Supreme Court denied Thomas's permission to appeal in August 2006. Thomas then filed a petition for post-conviction relief in the state court on August 20, 2007. This petition was denied, and the Tennessee Court of Appeals affirmed this denial. *Thomas v. State*, No. M2009–01523–CCA–R3–PC, 2011 WL 676182 (Tenn. Ct. Crim. App. Feb. 24, 2011). The Tennessee Supreme Court denied permission to appeal on July 18, 2011.

      Thomas promptly filed the instant petition for the writ of habeas corpus (ECF No. 1) on August 1, 2011, asserting four separate grounds for relief, which the Court construes as setting forth ten separate claims, as follows:

> Ground one: That the petitioner was arrested without probable cause, (Claim 1) because the information supporting the warrant did not specify whether the confidential informant was a "citizen" or a "criminal"; (Claim 2) because the warrant contained an allegedly deceptive claim regarding blood stains at the Petitioner's residence; and (Claim 3)

---

[1] Bruce Westbrooks is automatically substituted for his predecessor Jim Morrow as Warden of the Southeastern Tennessee State Regional Correctional Facility. Fed. R. Civ. P. 25(d)(1).

because a pertinent set of wedding rings was obtained by police pursuant to an illegal search;

Ground two: That the petitioner's confession was obtained illegally (Claim 4) in violation of his right to counsel and (Claim 5) in violation of his *Miranda* rights;

Ground three: That the jury pool was tainted by (Claim 6) a pretrial newspaper article and (Claim 7) statements made by one of its members, Verble Vickers; and

Ground four: That the petitioner's trial counsel was ineffective for (Claim 8) failing to object to the introduction of the wedding rings into evidence, (Claim 9) failing to call more than one witness to testify, and (Claim 10) failing to research pertinent medical issues.

(*See* ECF No. 1, at 5–10.)

Shortly after the petition was filed, the Court conducted a preliminary examination thereof and determined that it stated colorable claims for relief. Accordingly, the Court entered an order (ECF No. 4) directing the respondent to answer, plead or otherwise respond to the petition. Rule 4, Rules Gov'g § 2254 Cases.

The respondent submitted his answer (ECF No. 11), to which the petitioner has offered a reply (ECF No. 20). Upon consideration of the petition, the answer, the reply, and the expanded record, it appears that an evidentiary hearing is not needed in this matter. *See Smith v. United States*, 348 F.3d 545, 550 (6th Cir. 2003) (an evidentiary hearing is not required when the record conclusively shows that the petitioner is not entitled to relief). Therefore, the Court shall dispose of the petition as the law and justice require. Rule 8(a), Rules Gov'g § 2254 Cases.

## II.  FINDINGS OF FACT

### A.  Evidence Presented at Trial

The facts underlying the petitioner's conviction were summarized by the Tennessee Court of Criminal Appeals as follows:[2]

At the Defendant's trial, the following evidence was presented: Special Agent Bob Krofssik, of the Tennessee Bureau of Investigation ("T.B.I."), testified that, on January 22, 2000, he was contacted by the Putnam County Sheriff's Department to assist in an investigation. He said that on the following day he executed a search warrant for an older model mobile home on 6009 Burgess Falls Road, where the Defendant lived.

---

[2] State appellate court findings of fact can constitute factual findings in a habeas action. *See, e.g.*, *Girts v. Yanai*, 501 F.3d 743, 749 (6th Cir. 2007); *see also* 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

Specifically, the warrant allowed him to interview the Defendant and search for the body of Mary Thomas, the Defendant's wife, as well as any evidence that would reveal how she died. Agent Krofssik explained that, while interviewing the Defendant, the Defendant mentioned that he had Mary Thomas's wedding and engagement ring in a brown bag in his pocket. According to Agent Krofssik, the Defendant told him that when the Defendant returned home from work on Friday, January 21, 2000, the rings were on the counter in his home. The Agent testified that the Defendant told him that the victim was in the process of moving out of their home, but the day before her disappearance they had a conversation and she agreed to stay. The Defendant then told Agent Krofssik that, on the evening prior to the victim's disappearance, they went to a party at the Defendant's cousin's house. The Defendant then stated that he went to work the next morning, and when he returned home the rings were on the counter, the victim was gone, and he has not seen her since.

Agent Krofssik stated that, on September 12, 2002, he went back to the Defendant's property to execute another search warrant and an arrest warrant for the Defendant. He then testified that the Defendant was arrested and brought back to the Sheriff's Department, where the Defendant gave the following written statement:

Mary and I had agreed on how we were going to try and str[a]ighten out our li[v]es. [W]e [b]oth agreed we loved one another and were happy.

On [T]hursday morning we went to the liquor store[,] bought whiskey[.] [W]hen we got back we found out the law had been there[.] [W]e called the law. Linda Dilldine came out [and] talked to me and Mary. Everything was [oaky] (sic).

That night we went to the Norton[']s[.] I didn't drink but maybe [one] [b]eer. Mary and everyone else drank whiskey. Later that [n]ight when we went home she got violent, cursing me[,] threw her rings down[,] then she grab[b]ed a knife and s[w]ung at me [two] or [three] times[.]

I s[w]ung at her with my fis[t] trying to stop her[.] She jerked her head [b]ack and I hit her throat[.] I didn't mean to hit her there[,] [b]ut I did. I tried what I could to save her[,] [b]ut no use.

I s[a]t there all night[,] g[o]t a barrel and put her in it[.] Later[,] Friday morning[,] Ross [c]ame over to get me to go to work[.] I went to work and then to the [N]orton[']s be[]fore going home. [I] didn't say [any]thing to any[]one about Mary.

Roger c[a]me by Saturday[.] I asked for help. [The] Law came Sunday[.] I didn't know what to do so I [l]ied.

I hid the barrel behi[]nd the trail[e]r[.] [The] Law didn't find it[.]

I still [have] it.

Agent Krofssik testified that thirty-one months passed between the date of his initial questioning of the Defendant and the date of the signed confession. Agent Krofssik said that the barrel with a body, later identified as the victim, was subsequently found on the Defendant's property.

On cross-examination, Agent Krofssik testified that he had taken statements from many people with information pertinent to his investigation and that he had written these statements out himself and had each declarant read and then sign their statement. When questioned about a statement made by Robert Williams, Agent Krofssik could not recall if Williams was illiterate or had requested permission for his wife to be present while giving his statement.

Agent Krofssik agreed that, from the time of the Defendant's confession, the Defendant was cooperative, non-threatening, and seemed genuinely concerned about the victim's body. He further testified that, although he was present on the Defendant's property when the barrel containing the victim's body was discovered and that he was present in the Medical Examiner's Office when the barrel was opened, he merely followed the vehicle containing the barrel to the Medical Examiner's Office and never witnessed the contents of the barrel at the Defendant's property. Agent Krofssik testified that he was not aware of any identifying marks or numbers that were put on the barrel before it was taken to the Medical Examiner's Office, however, he was insistent that the barrel from the Defendant's property was the same barrel opened at the Medical Examiner's Office.

On re-direct examination, Agent Krofssik testified that blood was found underneath a rug that had been stapled down to the floor in the Defendant's trailer. According to the agent's testimony, there was a layer of mud over the blood, and the Defendant told him the blood was dog's blood. On re-cross examination, Agent Krofssik agreed that no test had shown that the blood in the Defendant's home was human blood and that even if it were human blood, that would be consistent with the Defendant's tape recorded confession stating that some blood came from the victim's mouth.

Tommy Manier testified that he had known the victim since 1995, and she had moved in with him in January of 1996. He said that she stayed with him for several months and that they had a romantic relationship. He stated that the two had remained close until her disappearance and described himself as "a good close friend" of the victim. Manier said that in the weeks prior to the victim's death he had been sending friends over to check on her and agreed that this was done because he had concerns for her. He stated that two days prior to the victim's disappearance she had come over to his house and brought her clothes and a few other items and left them. Manier testified that about two weeks prior to the victim's death the Defendant came to his home looking for the victim and told Manier to tell the victim that she had one hour to get home or he would take "another course of action," and she would know what the Defendant was talking about.

On cross examination, Manier stated that when the victim moved out of his home in the late summer or early fall of 1996, she moved in with the Defendant. He said that he maintained sporadic contact with the victim from 1996 through 1999, but he did not have sexual relations with her. He stated that the victim moved in with him for a second time in January of 2000, but the relationship remained plutonic (sic). Manier testified that he stopped on the Defendant's property to talk with the victim from time to time, however, he said that he only did so because he often had to drive down their street and would see the victim in the front yard. He again denied that he was having any sexual relations with the victim before her death.

Vickie Holliman testified that she was "[b]est of friends," with the victim. One evening, about one week prior to the victim's disappearance, Holliman and the victim had gone to Walmart. Upon returning from Walmart, Holliman helped the victim bring some items into the trailer where she lived with the Defendant. Holliman said that, when they entered the trailer, the defendant was "waiving" a gun and told Holliman that if he found out that Holliman had been taking the victim to see Manier he was "going to kill every [ ]one of [them]." Holliman said that the Defendant had made similar statements two or three times in the weeks leading up to the victim's death and that the Defendant referred to the victim as "bitch [and] whore." The day that the victim was killed, Holliman and the victim drove past the Defendant on the road, but did not stop. Later that day the victim requested Holliman take her to the Defendant's residence. Holliman told her she did not want to take the victim to the Defendant's because she was "afraid something might happen" to her. Holliman took the victim to the Defendant's anyway, and the victim and

Defendant got into an argument. During this argument, the Defendant was calling the victim names and "jerked her by the arm."

On cross-examination, Holliman stated that she did not believe that there was any kind of romantic relationship between Manier and the victim in the time leading up to the victim's death.

Roger Fisher testified that two days after the victim was murdered, January 22, 2000, the Defendant called Fisher to his home and told Fisher that he and the victim had been in an argument, and he had let things go too far and had hid her in a barrel. The Defendant asked Fisher for help in disposing of the body and asked if Fisher could get a boat so that they could take the victim to Cane Hollow, a remote area with no developments. Inside the Defendant's trailer there was an area stained with blood with a smear of mud over it. The Defendant told Fisher that it was dog's blood. There was no rug covering the stained area. The Defendant also told Fisher that he did not like Manier. Two or three hours later, Fisher reported the conversation to the police. Fisher said that he was not offered anything in exchange for his testimony and he did not feel threatened or have words put in his mouth by the detective who interviewed him. The day following Fisher's statement to the police, he was recalled to the Sheriff's Department and asked to confront the Defendant, which he stated was not easy to do. He said "tell them where she is," and the Defendant responded by saying "[w]hy are you doing this to me?"

On cross-examination, Fisher testified that he could not remember seeing a rug in the Defendant's house, but he conceded that he may have previously stated that there was a throw rug somewhere in the house. Fisher had drank (sic) seven or eight beers by the time he got down to the Sheriff's Department to make his statement on January 22, and when asked if he was intoxicated, he replied "[b]y law standard[s], yes." Fisher would not agree with the suggestion that the number of beers he drank that day had an effect on his memory of the events. Fisher could not testify as to what happened between the Defendant and the victim on the day of the murder because the Defendant never explained exactly what transpired. Fisher said that he was never told he could be facing charges as an accessory to murder and was offered no help with a recent DUI arrest in exchange for his testimony. Fisher also stated that he does not own a boat. On re-direct examination, Fisher stated that he has several family members who own boats and that he could borrow those boats at any time.

Anthony Thomas, the Defendant's son and the victim's stepson, testified that he was interviewed by Agent Krofssik while in jail, and he received no special arrangement in exchange for his testimony. Thomas came forward with information pertinent to the case by his own volition because he was coming off of methamphetamine and wanted to begin moving on with his life by putting the incident in question behind him. Around a week after the victim was murdered, the Defendant showed up at Thomas's house. This was the first time that the Defendant had ever been to Thomas's house. The Defendant told Thomas that the Defendant and the victim were drunk and got into a fight. The victim told the Defendant that she was leaving him, and the Defendant said that she was not going to leave him. The victim said, "by God, I'll leave," and she pulled a knife. The Defendant attempted to defend himself and hit the victim in the throat. The victim fell to the floor where she lay gasping for breath. The Defendant was holding the victim and telling her to wake up. She was not responding, and was "gargling." Thomas testified that the Defendant did not want her to suffer anymore, so he "[c]hoked her the rest of the way out."

Thomas attempted to help the Defendant by buying him some canned goods and night vision goggles and dropping him off in the woods. On another occasion, a man named Robert Williams picked Thomas up at work and told him that he needed to go with Williams to the Defendant's house. Williams and Thomas went into the trailer and retrieved a bag full of money and clothes. Thomas stated that Williams got the money by

pawning a tractor, and Thomas believed there was a couple hundred dollars in the bag. Thomas was told by Williams not to say anything to anyone and to take the bag back to work with him. After work, Thomas was to take the bag to the Defendant in the woods, but the Defendant was not there, however, Thomas eventually was able to locate him.

Thomas stated that in the past he had told Agent Krofssik things that were not true, but he said that this was not because he did not know what happened. Thomas agreed that he waited more than two years to come forward with this information. He stated that he finally came forward because when she victim's family kept asking when she was going to come back, and they were in great distress. He also felt that the Defendant was very remorseful and that had some impact on Thomas's desire to come forward.

On cross-examination Thomas admitted that he had been a methamphetamine user at different points in his life. He stated that he relapsed into drug use after learning that his father had killed Mary Thomas. His drug use made him paranoid and brought on hallucinations. Thomas denied that Williams ever showed him the barrel or the corpse inside the barrel, however, he admitted that he had made a statement to Agent Krofssik that such an occurrence did take place. Thomas claimed that he had lied to Agent Krofssik but had only done so to protect the Defendant. On re-direct examination, Thomas testified that when the Defendant told him about the murder, he had been off of drugs for three years.

Richard Farley, the victim's son, testified that he had a DNA test administered to him in order to facilitate identification of the victim's body. He had not seen the victim in eight or nine years prior to her disappearance.

Mary Michelle Beech testified that she was the victim's daughter and gave a DNA sample to be used to help positively identify the victim's body. She had not seen the victim in ten or eleven years.

Camille Denise Leverette testified as an expert witness that she works at Orchid Cellmark in Nashville, which is a DNA testing laboratory. She took DNA samples from a femur and two molars taken from the body in the barrel discovered on the Defendant's property and compared the DNA patterns with those taken from Richard Farley and Mary Michelle Beech. This was done to determine if the body in the barrel was that of Mary Thomas. There was a 98.7% probability that the body in the barrel was Richard Farley's mother, and a 99.6% probability that the body in the barrel was Mary Michelle Beech's mother. Leverette stated that those were "very good numbers." Leverette also testified that when the two numbers were looked at in conjunction, they were an even stronger indicator of maternity.

Doctor Amy McMaster, who works for the Medical Examiner's Office in Nashville, testified that on September 13, 2002, she performed an autopsy on the body of Mary Thomas. The autopsy report included the following:

The decomposed intact remains of a white female and recovered from within the barrel. The decedent is dressed in a black leather jacket, heavy sweater, pants (possibly denim jeans), socks, panties, bra, and white leather athletic shoes. A piece of duct tape was found on the front of the sweater.

Evidence of injury includes fractures of the right and left horns of the thyroid cartilage and fractures of the hyoid bone. These fractures are indicative of strangulation with compression of both sides of the neck.

The advanced decomposition precludes determination of additional injuries on the skin and neck muscles.

In summary, the cause of death is strangulation. The manner of death is homicide.

The victim's body was in advanced putrefactive decomposition with diphtheria and the hands were partially mummified, which would be consistent with a body that had been in a barrel for more than two years. The body weighed one hundred and four and one half pounds. Dr. McMaster opined that the weight of the corpse was probably the same as the weight of the body prior to death, and that in some phases of decomposition, a body "may gain a little bit of water weight or weight due to insect activity or it may lose weight due to . . . dehydration." It was Dr. McMaster's opinion that although it was possible to strangle someone without leaving marks on the neck or breaking bones, the injuries suffered by the victim in this case were affirmative indicia of strangulation. Furthermore, the possibility that the victim suffered her injuries by being hit in the neck, open-handed, were "minimal . . . . less than one percent." When questioned about whether a boxer is likely to suffer from these types of injuries, the doctor said that she would not expect to see such injuries as the result of a boxing match.

Dr. McMaster next testified about the subtleties of strangulation. She stated that when someone is strangled, they die because blood cannot flow to and from their brain and that strangulation does not kill a person by keeping them from breathing. She testified that the time it would take to kill someone in this fashion is highly variable, depending on how hard the victim was struggling, but in general she estimated it would take ten to fifteen seconds to bring someone to a state of unconsciousness. However, she said that if the pressure applied to the neck was released once the victim fell unconscious, no permanent damage would be suffered, and the victim would likely regain consciousness in time. To kill the victim would require the attacker to keep the pressure applied to the neck for an additional thirty to sixty seconds, although, again, these numbers may vary from case to case. Dr. McMaster said she did not believe there was any possibility that the victim's body in this case sustained the injuries associated with strangulation when she was placed in the barrel.

On cross-examination, Dr. McMaster testified that she was not given any information from the TBI regarding how the victim may have been killed. She stated that it was not possible to tell if the victim was strangled manually with someone's hands or with a ligature, such as a length of cord. An x-ray revealed that, aside from the fractures in the neck, there were no other broken bones in the body. Dr. McMaster stated that although age can have some impact on the amount of force necessary to break bone, in this case, the victim's age was not relevant. The doctor was not familiar with any cases where the hyoid bone was broken from something other than strangulation. Additionally, the doctor was not familiar with any cases were the thyroid cartilage or hyoid bone were broken during the autopsy. Dr. McMaster conceded that it was possible to break the hyoid bone with a blow from below, but that a blow from below could not break the thyroid cartilage. She also indicated that it was possible to break the hyoid bone in a high-speed auto accident, but the thyroid cartilage would not be broken in such a case. When questioned further on this subject the doctor stated that, although "anything is possible," it was not consistent with her knowledge on the subject and it was not probable.

Dr. McMaster agreed that it was possible that alcohol may have some impact on the time it would take a person to become unconscious or die from strangulation and that it was possible that alcohol could hasten the process.

The trial court then read to the doctor some questions from the jury. In response to these questions, Dr. McMaster testified that she believed that a very forceful blow to the neck with a closed fist or with an instrument could cause spasms, but not the type of injuries that the victim in this case sustained. She next stated that, although it was possible to have some bleeding from the mouth based upon a blow to the neck, she would not expect there to be much blood from such a blow and that bleeding from the

mouth is more likely to be caused by a blow to the mouth. However, she admitted that it was conceivable that a blow to the neck could cause the teeth to clamp down on the tongue, which could produce bleeding. She stated that it was possible for thyroid cartilage to decay to the point where damage could not be detected, but in this case that had not happened.

Jerry Norton, the Defendant's cousin, testified that the Defendant and the victim were at Norton's house the evening of the murder for approximately two to three hours. The Defendant and victim both came and left together. The victim was in "good spirits . . . laughing [and] having a good time." The Defendant drank four or five beers and was slightly intoxicated, but not drunk. The victim had more to drink than the Defendant and was drinking liquor as well. She was "fairly well intoxicated."

On cross-examination, Norton testified that the victim was not a "mean" drunk, that she was always a pleasant person to be around, and that she always treated the Defendant well. The night before the murder, the victim and the Defendant were over at Norton's house because they were celebrating that they had reconciled. On Friday, January 21, 2000, the Defendant returned to Norton's around 11:00 a.m. and asked Norton to cut some lumber for him, so he could build some kitchen cabinets for the victim. The Defendant acted normal and did not ask for help hiding a barrel or for use of Norton's boat. Norton had never seen the Defendant mistreat the victim.

*State v. Thomas*, 2006 WL 1446842, at *1–*7 (bracketed alterations in the original).

As stated above, on the basis of this evidence, the petitioner was found guilty of first-degree premeditated murder and convicted to life in prison with the possibility of parole.

### B.      Post-Conviction Evidence

The state appellate court summarized the evidence presented at the post-conviction hearing as follows:

Robert Williams testified that he has known Petitioner for more than twenty years. Mr. Williams said that he had an eleventh-grade education and was able to write his name and read "stop signs," but other than that, he was illiterate.

Mr. Williams testified that he was interviewed before Defendant's trial at the sheriff's office by Agent Bob Krofssik of the Tennessee Bureau of Investigation (TBI). He told Agent Krofssik that he was unable to read or write and requested that his wife be present if he needed to give a statement because his wife helped him with "documents." Mr. Williams claimed that Agent Krofssik told him that his wife did not need to be present and that Agent Krofssik would write out what Mr. Williams said. He then gave a statement to Agent Krofssik and signed the written statement.

Mr. Williams testified that he was later interviewed in the front yard of his home by Petitioner's attorney, Ricky Jenkins. Mr. Williams' wife was also present, and he told Mr. Jenkins that he could not read or write. Mr. Williams testified that Mr. Jenkins was there for ten to twenty minutes and did not show him the written statement taken by Agent Krofssik or read it to him line by line.

Mr. Williams claimed that several things in the written statement were not accurate. He agreed that he told Agent Krofssik that Petitioner admitted to killing the victim, but it was an accident. However, Mr. Williams testified that Petitioner did not tell him that he hit the victim in the throat and choked her to death as was reflected in the statement. Concerning other portions of the statement, the following exchange took

place between post-conviction counsel and Mr. Williams:

Q.  On the second page of the typewritten statement, about half way down in the first paragraph, I'm reading, "I told Tony what his daddy told me about killing Mary."  Did you say that?

A.  No.

Q.  You never told Agent [Krofssik] that statement?

A.  No.

Q.  In the next paragraph, on page 2, I'm reading, "He told me, if the police can't find her body or a murder weapon, they could never prosecute him."  Did Arlie Thomas ever tell you that?

A.  No.

Q.  Did you tell Agent [Krofssik] that Arlie Thomas ever said that?

A.  No, sir.

Q.  The last sentence of that paragraph on page 2 I'm reading, "I already know what he wanted to happen to Roger Fisher, and I didn't want anything to happen to me or my family."  Did Arlie Thomas say that to you?

A.  No, sir.

Q.  Did you tell Agent [Krofssik] that he said that?

A.  No, sir.

Q.  And further, in the last paragraph, it states, "I just remember that a few months after Arlie first came to my house and told me what happened, we did a tree job together in White County."  Did you ever tell that to Agent [Krofssik]?

A.  No, sir.

Q.  In fact, did you ever work with Arlie Thomas after the disappearance of Mary, the victim in this case?

A.  No, sir.

Q.  Further down in that last paragraph, it says, "Arlie pointed to a pine tree about 75 to 100 feet from his trailer."  Did Arlie ever point out a pine tree or a location?

A.  No, sir.

Q.  Did you ever tell Agent [Krofssik] that Arlie did that?

A.  No, sir.

On cross-examination, Mr. Williams testified that he was able to read his name, his address on Neal Street, and the word "Cookeville" that appeared on his written statement, but he was unable to read anything else.  Mr. Williams acknowledged that his initials appeared many times on every page of the statement because Agent Krofssik "said he had to change the words, so he had to have me initial it."  He claimed that Agent Krofssik did not review every sentence with him verbatim and have him initial it, and he had no idea what he was initialing.

Mr. Williams testified that Mr. Jenkins did not specifically ask him if Petitioner told him that Petitioner choked the victim, and he denied walking away from Mr. Jenkins when he asked the question. He claimed that he fully cooperated with the interview, and he denied telling Mr. Jenkins that he did not want to testify at trial. Mr. Williams testified that he had cancer at the time of Petitioner's trial.

Petitioner testified that the affidavit in support of the arrest warrant in his case, dated September 11, 2002, was erroneous because Agent Krofssik made reference to what appeared to be red blood stains on the kitchen floor. However, the copies of the laboratory reports received from the Tennessee Bureau of Investigation (TBI), dated January 26, 2000, and February 4, 2000, concerning floor samples, failed to find "the presence of blood." Petitioner testified that the affidavit in support of the search warrant also referenced blood stains on the floor. He felt that the statements were placed in the affidavits to "deceive the Court, and for no other apparent reason, because if you've got test stains, test results, saying that these are nothing, then you should not put them in." Petitioner testified that although trial counsel filed "bunches and bunches" of motion on his behalf, they did not discuss the issue of blood stain references in the affidavits, and trial counsel did not file a motion to challenge the affidavits. Petitioner also felt that trial counsel should have challenged the identity and statements made by Roger Fisher in the affidavit supporting the arrest warrant.

On cross-examination, Petitioner acknowledged that he confessed to killing the victim. He also admitted that he sent a letter to trial counsel on April 3, 2006, the day after his trial, offering an apology to trial counsel. The letter also stated: "I'm proud of the way you handled my case. I believe your around [sic] work—your ground work and motions in pre-trial preparation was great effort on your part and your secretary." Petitioner testified that trial counsel visited him many times at the jail, and filed at least thirteen motions on his behalf. He acknowledged that trial counsel sent him a letter indicating that trial counsel interviewed Mr. Williams. Petitioner did not recall if he and trial counsel discussed whether Mr. Williams would make a good witness. He denied telling trial counsel that Mr. Williams was a "liar and a snitch" and that Mr. Williams would not show up for trial because he had cancer. Petitioner testified that Mr. Williams was "there for jury voir dire each time until the D.A. turned him loose and told him to leave." He acknowledged that trial counsel filed a motion attacking the search warrant on the issue of consent.

Trial counsel testified that prior to trial, he was aware that Mr. Williams was illiterate because they discussed the issue when he interviewed Mr. Williams. During the interview, he showed Mr. Williams the statement given to Agent Krofssik, and Mr. Williams acknowledged that it was the statement that he had signed. Concerning the interview, trial counsel said:

> He told me—as a matter of fact, I went into that—and let me say that I was interviewing him because he was listed as a witness for the State. And Mr. Thomas and I were both hoping that he would not come and testify for the State, because of the things that he had made—statements he had made in that statement. I was there from the perspective that I wanted to see what he had to say for cross-examination purposes.
>
> So I started to ask him about the background of that statement, that he had gave it, and if he could read and write and so forth.

Trial counsel testified he asked Mr. Williams about the background of the statement, "his abilities and so forth, and how the statement was done, and he said that this agent, TBI agent, had read it to him and had wrote it out for him because he couldn't read and write." Mr. Williams acknowledged that he told Agent Krofssik that Petitioner said he accidently killed the victim. When asked if Petitioner had told Mr. Williams that he choked the victim

to death, Mr. Williams could not recall, and he ended the interview by walking into the house. Trial counsel testified that he did not return to Mr. Williams' house to ask about other portions of the statement because "[i]t didn't seem to be a very friendly place to go after that." When asked if he considered using Mr. Williams as a witness at trial, counsel said:

> I went back to meet with Arlie Thomas at the jail, and we discussed it, after I had been to see Robert Williams. And I had described to him, as I'm describing to you, what had transpired at Robert Williams' home, about how, "Yeah, he said it was an accident," but then he wouldn't tell me that he didn't say that he choked her to death, and these other things. And Mr. Thomas described—because—Robert Williams had—the statement included, that Robert Williams said he had choked her to death. He said that Robert Williams was a snitch and a liar, and we didn't need him for nothing. And he and I both discussed the fact that we didn't want to call him, and Arlie Thomas agreed not to call him for no [sic] witness.

> You see, there's no good part in here, because Robert Williams says in one place that it's an accident, but if I had called him as a witness, that would have been objected to by the State, because that is a self-serving hearsay statement that would not be admissible anyway. And if you put him on the witness stand and—because I don't know what he's going to say, and I put him on there, I don't know if he's going to say that—all he's got to do is say that Arlie told him he choked her to death, and the case if over. I mean, it's just over. Because it's based on whether or not this is an accident or whether this was an intentional killing.

Trial counsel testified that prior to trial, he was aware that samples from Petitioner's floor failed to reveal the presence of blood. He noted that the affidavits in support of the arrest warrant and search warrant did not allege that there were any human blood stains on the floor. "It simply says that he was at Arlie Thomas' home, and Arlie Thomas was trying to remove blood stains from the kitchen floor." Trial counsel also pointed out that the affidavits stated that the killing was based on strangulation, not a bleeding injury. Trial Counsel testified that he did not challenge the veracity of the statements contained in the affidavits because:

> To my knowledge, to this date, I would have had no proof whatsoever to rebut the fact that there was not—that he was not trying to get blood stains off the floor. And that aff—that aff—those affidavits are so full of other, such other information that the search warrants are not really based on that. I would perhaps, if that was all it was based on, but it's not all it's based on. It doesn't say that it's blood. [sic] and I don't—I just didn't—Arlie Thomas and I didn't see that it was relevant. And I discussed that with him also.

Trial counsel testified that Agent Krofssik was "just relating the whole story" by mentioning the stains. He also noted that it had also been stated that the blood was dog blood. In any event, trial counsel did not feel that there was any way to challenge the affidavits. Concerning Roger Fisher, trial counsel said:

> Well, you've mentioned several names that are not in the petition, so when I look through this file, look at the petition that Mr. Thomas and yourself have filed, and I have a box with every name that he ever gave me with a folder with the name of the witness on it, we looked at it—we searched criminal records of every witness that the State was going to use, and all I could come upon—and I remember this—today, I didn't really look at Roger Fisher's file, because I didn't know about it, but the only thing that I could find that he had was traffic offenses that were not impeachable offenses for us to question him on.

On cross-examination, trial counsel testified that he and Petitioner discussed Mr. Williams, and it was Petitioner's decision not to call him as a witness. Additionally, trial counsel noted that at the end of trial, Petitioner "relayed that he was glad that we didn't call Robert Williams." Trial counsel testified that there was a full hearing concerning the search warrant and the arrest warrant on other grounds than the mention of blood stains in the affidavits. He also noted that even though officers had a search warrant, Petitioner consented to the search of his person and his property.

*Thomas v. State*, No. M2009–01523–CCA–R3–PC, 2011 WL 676182, at *8–*11 (Tenn. Ct. Crim. App. Feb. 24, 2011) (bracketed alterations in original).

## III. ANALYSIS OF CLAIMS

Of the ten claims identified by the Court, only one of them—Claim 3—arguably concerns a federal constitutional issue that was fairly presented to the Tennessee state courts for consideration as required by 28 U.S.C. § 2254(b)(1)(A), and as such is properly before this Court for review under § 2254(d). The remaining claims were either never presented at all in the lower courts, or were presented under different theories. Because they were never fully and fairly presented to the Tennessee courts, and because the time for doing so has passed, these claims are barred by procedural default. As set forth below, the Court finds that none of the claims, even if considered on the merits, provides a valid basis for habeas relief.

### A. Procedurally Defaulted or Waived Claims

#### 1. Standard of Review of Defaulted Claims

A federal district court will not entertain a petition for writ of habeas corpus unless the petitioner has first exhausted all available state-court remedies for each claim in his petition. 28 U.S.C. § 2254(b)(1). While exhaustion is not a jurisdictional requirement, it is a strictly enforced doctrine which promotes comity between the states and the federal government by giving the state an initial opportunity to pass upon and correct alleged violations of its prisoners' federal rights. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). Consequently, as a condition precedent to seeking federal habeas corpus relief, the petitioner is required to fairly present his claims to every available level of the state court system. *Rose v. Lundy*, 455 U.S. 509, 518–20 (1982); *see also Duncan v. Henry*, 513 U.S. 364, 365–66 (1995) ("[A] federal habeas petitioner . . . [must] provide the state courts with a 'fair opportunity' to apply controlling legal principles to the facts bearing upon his constitutional claim."). Moreover, "the doctrine of exhaustion requires that a claim be presented to the state courts under the same theory in which it is later

presented in federal court." *Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998). Once his federal claims have been raised in the highest state court available, the exhaustion requirement is satisfied, even if that court refused to consider the claims. *Manning v. Alexander*, 912 F.2d 878, 883 (6th Cir. 1990).[3]

A habeas petitioner bears the burden of demonstrating that he has properly and fully exhausted his available state court remedies with respect to the claims he presents for federal habeas review. *Prather v. Rees*, 822 F.2d 1418, 1420 n.3 (6th Cir. 1987) (citation omitted). If a habeas petitioner retains the right under state law to raise a claim by any available procedure, he has not exhausted that claim. 28 U.S.C. § 2254(c). Ordinarily, habeas petitions containing unexhausted claims are dismissed without prejudice in order to permit the petitioner the opportunity to pursue them in state court. *Alley v. Bell*, 307 F.3d 380, 385 (6th Cir. 2002) (citing *Rose*, 455 U.S. at 518, 520–22); *see also Rhines v. Weber*, 544 U.S. 269 (2005) (reconfirming the continued relevance of *Rose* under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")). However, if an unexhausted claim would be procedurally barred under state law, for instance by statutes of limitations or state rules barring successive petitions, then the claim is deemed exhausted (because no further state review is available) but procedurally defaulted, and may not be considered by the federal court on habeas review except under extraordinary circumstances. *Alley v. Bell*, 307 F.3d 380, 385–86 (6th Cir. 2002) (citations omitted); *In re Cook*, 215 F.3d 606, 607–08 (6th Cir. 2000). Specifically, in order to obtain consideration of a claim that is procedurally defaulted, a petitioner must demonstrate both cause for the procedural default and actual prejudice resulting from the alleged constitutional errors, or alternatively that failure to consider the claims will result in a "fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *cf. Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Engle v. Isaac*, 456 U.S. 107, 129 (1982); *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).

"Cause" is difficult to prove. In elaborating on the term, the Supreme Court has stated that "the mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default." *Murray*, 477 U.S. 486. Rather, "the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show

---

[3] In Tennessee, review by the state Supreme Court is not required for exhaustion. Instead, "once the Court of Criminal Appeals has denied a claim of error, 'the litigant shall be deemed to have exhausted all available state remedies available for that claim.'" *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003) (quoting Tenn. S. Ct. R. 39).

that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Id.* at 488. Examples of such objective factors include "a showing that the factual or legal basis for a claim was not reasonably available to counsel" or that "some interference by officials made compliance impracticable." *Id.* (internal quotation marks and citations omitted). If the petitioner fails to show cause for his procedural default, it is unnecessary for the court to reach the prejudice issue. *Smith v. Murray*, 477 U.S. 527, 533 (1986).

What qualifies as "actual prejudice" appears to depend upon the type of error involved. For instance, to show prejudice in the context of an alleged *Brady* violation, a plaintiff must show there is a "reasonable probability that the outcome of the trial would have been different" but for the alleged constitutional error. *Jalowiec v. Bradshaw*, 657 F.3d 293, 305 (6th Cir. 2011) (citing *Strickler v. Greene*, 527 U.S. 263, 289 (1999)). To show prejudice resulting from an erroneous jury instruction to which no contemporaneous objection was made, the plaintiff must show that "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *United States v. Frady*, 456 U.S. 152, 169 (1982) (citation omitted). Whatever the context, the standard is high.

The standard for showing a "fundamental miscarriage of justice" instead of cause and prejudice is even higher. A "fundamental miscarriage of justice" is deemed to occur when "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray*, 477 U.S. at 496.

Only one of the claims asserted in the present petition, Claim 3, was ever fully and fairly presented to the state courts on direct appeal or during post-conviction proceedings.[4] Claims 1, 2, 4, 5, 6,

---

[4] On direct appeal, the petitioner raised the following issues: (1) that the evidence at trial was insufficient to convict petitioner of first-degree murder; (2) that the trial court erred in overruling the petitioner's motion to suppress illegally seized evidence, including the two rings and the barrel in which the victim's body was hidden, both of which the petitioner claimed were "the fruits of illegally obtained information received from Mr. Thomas in violation of his Sixth Amendment right to counsel" (ECF No. 12-19, at 16); (3) that the trial court erred in denying the petitioner's motion to continue and for a change of venue because of pretrial publicity; (4) that the trial court erred in allowing into evidence two photographs that were irrelevant; (5) that the trial court erred in denying a new trial because of improper arguments by the district attorney; (6) that the trial court erred by failing to allow into evidence an admission against the state offered by the petitioner; and (7) that the trial court erred in not granting the petitioner's request for a mistrial after the jury pool had been tainted. (ECF No. 12-19, at 1, 8–29.)

In his post-conviction brief to the Tennessee Court of Criminal Appeals, the petitioner argued that the trial court had erred in denying his petition for post-conviction relief on the grounds that (1) his trial counsel was ineffective for failing to move to suppress the petitioner's confession on the basis that his arrest was unlawful due to an insufficient Affidavit of Complaint, specifically because the Affidavit did not identify whether Roger Fisher, the informant to whom much of the information in the Affidavit was

7, 8, and 9 were presented to the state courts in some form, but not under the same theory in which they are now presented. Claim 10 was never presented at all, in any form, to the state courts.

It is clear under Tennessee law that no state remedy remains available to the petitioner for seeking review of the claims that are presented here for the first time. *See* Tenn. Code Ann. § 40-30-102(a) (establishing a one-year statute of limitations for the filing of a petition for post-conviction relief); § 40-30-102(c) (permitting the filing of only one post-conviction petition by state prisoners); § 40-30-117 (setting forth the very narrow grounds under which a petitioner may file a motion in the trial court to reopen his first post-conviction petition). Thus, the claims are technically exhausted but procedurally defaulted. *See Alley v. Bell*, 307 F.3d 380, 385 (6th Cir. 2002) (holding that if an unexhausted claim is procedurally barred under state law, the claim is procedurally defaulted for purposes of federal habeas corpus review).

To obtain review of these claims despite their defaulted status, the plaintiff cannot rely on conclusory assertions of cause and prejudice. Rather, he must present affirmative evidence or argument as to the precise cause for the failure to raise the claims before the state court and the prejudice that resulted. *Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006) (citations omitted). The petitioner here has shown neither cause[5] nor prejudice, nor has he made any attempt to claim that failure to consider the claims how will result in a "fundamental miscarriage of justice." The Court has nonetheless examined the merits of each of the claims presented and found that none is meritorious, as discussed below.

### 2. Claims 1 and 2

In Claim 1, Thomas asserts that he was arrested without probable cause because the affidavit supporting the arrest warrant did not specify whether the informant who supplied information in support of

---

attributed, was a citizen informant or a criminal informant, or what type of relationship Fisher had either with the petitioner or with the affiant (Agent Krofssik); (2) trial counsel was ineffective for failing to move to suppress all evidence obtained as a result of the 2002 search warrant on the basis that the Affidavit for Search warrant contained intentionally misleading information intended to deceive the court, specifically, a reference to "what appeared to be red stains on the kitchen under the carpet," when Krofssik already knew that the flooring material had been tested in 2000 and "failed to reveal the presence of blood" (ECF No. 12-26, at 11); and (3) that trial counsel failed to properly interview Robert Williams and failed to call him as a defense witness at trial. (ECF No. 12-26, at 4, 10–13.)

[5] The only argument for "cause" that Thomas presents with respect to any of the procedurally defaulted claims is that Thomas's public defender took care of the appeal, and Thomas himself had very little input into it. As set forth above, "the mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default." *Murray*, 477 U.S. 486.

the warrant was a "citizen" informant or a "criminal" informant.  In Claim 2, Thomas similarly asserts that the affidavit of complaint is defective because it contained deceptive allegations regarding blood stains on his kitchen floor.  Thomas raised both of these arguments in his post-conviction proceedings but in the context of an ineffective-assistance-of-counsel argument, that is, that his trial counsel was ineffective for failing to raise the issues in the trial court.  As set forth above, "the doctrine of exhaustion requires that a claim be presented to the state courts under the same theory in which it is later presented in federal court."  *Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998).  Because the issues were not fully and fairly presented to the state trial court on the same theory as it is presented here, the claim is procedurally defaulted.

Regardless, the claim is without merit.  Even if this Court were to accept Thomas's argument that the affidavit of complaint fails to state facts sufficient to provide probable cause for the arrest, or contains misleading facts, an arrest pursuant to a facially invalid arrest warrant does not violate the Fourth Amendment if the arrest itself is nonetheless supported by probable cause.  *See Criss v. City of Kent*, 867 F.2d 259, 262 (6th Cir. 1988) ("Arrest without a warrant does not violate the Fourth Amendment if probable cause exists. . . .").  Where an arrest is made absent a valid warrant, or pursuant to an invalid warrant, "the question becomes . . . whether the arresting officers were justified in their belief that plaintiff had probably committed or was committing a crime."  *Id.*; *see also Whiteley v. Warden*, 401 U.S. 560, 568 (1971) (holding that arrest violated the Fourth and Fourteenth Amendments where the affidavit supporting the arrest warrant did not show probable cause and the arresting officer himself was not in possession of additional information that would have established probable cause).  In Thomas's case, there is no dispute that the arrest was supported by probable cause, irrespective of whether the actual arrest warrant laid out all the pertinent facts.[6]  The question of whether the arrest warrant was invalid is therefore immaterial.

### 3.    *Claims 4 and 5*

Although the specific issues raised in Claims 4 and 5, that the petitioner's confession was obtained illegally in violation of his right to counsel and his *Miranda* rights, were never raised in the state

---

[6] The affidavits in support of both the January 2000 search warrant and the September 2002 search warrant both specified that Fisher was a "citizen informant" and provided detailed information as to the relationship between Fisher and Thomas, and the conversation between them that led Fisher to the police in the first place.  (See ECF No. 12-15, at 10, 5.)

proceedings, the trial court and the Tennessee Court of Criminal Appeals both were called upon to consider the related question of whether other evidence (including the barrel containing the victim's body) was obtained in violation of the Fourth Amendment or the petitioner's Sixth Amendment right to counsel. The trial court specifically found, as a factual matter, that Thomas

> received the required Miranda warnings as given to him by Deputy Harris of the Putnam County Sheriff's Department prior to his arrest and the [D]efendant confirmed to Officer Harris that he understood those rights.
>
> The court further finds that Agent Krofssik did not re-advise the [D]efendant of these rights, but within ten, fifteen, twenty minutes outside from the time that he was given his rights and confirmed to Deputy Harris that he understood them, that he was interviewed and voluntarily interviewed by Agent Krofssik at the sheriff's office and did not request an attorney, even though this man had two years of college and even though he had been through this twice, on two prior occasions with Agent Krofssik, been interviewed, waived his rights and had been told of his rights.

*State v. Thomas*, 2006 WL 1446842, at *14 (quoting trial court's opinion).  Based on its factual conclusion that Thomas had been given and understood his *Miranda* rights, the trial court ruled as a legal matter that "statements to Agent Krofssik upon arrival at the Sheriff's Department, and the barrel containing the victim's body, as well as the body itself, were all admissible as evidence at trial."  *Id.*  The Tennessee Court of Criminal Appeals affirmed on the basis that the evidence did not preponderate against the state court's factual findings, and the court cited specifically to the Fourth and Sixth Amendments to the United States Constitution and to federal and state case law construing those provisions.  *Id.* at *12.

Thus, although the petitioner's claims here were not actually raised in the state courts, the trial court specifically considered the question and found that Thomas's statements—including his confession—were given voluntarily after he had been read his *Miranda* rights and notified of his right to counsel.  That conclusion was affirmed by the Tennessee Court of Criminal Appeals.  The decision did not involve an unreasonable determination of the facts in light of the evidence presented in the state-court proceeding.  Cf. 28 U.S.C. § 2254(d).  Nor was the decision contrary to clearly established federal law.  In short, there is no evidence in the record to support the petitioner's claim that he was unaware of his right to counsel, that he ever requested and was denied the right to counsel, or that his confession was anything other than completely voluntary.

### 4. Claims 6 and 7

In Claims 6 and 7, Thomas complains that the jury pool was tainted by pretrial publicity and by

statements made to the jury pool by a potential juror, Verble Vickers. These claims, broadly construed, are grounded in the Sixth Amendment right to be tried by an impartial jury. These claims were raised during the state proceedings, but they were not presented or considered as issues of constitutional magnitude. Rather, they were presented and decided as state law claims.

With respect to pretrial publicity, trial counsel argued that "[t]he trial court abused its discretion by not granting . . . Mr. Thomas's attorney's request for a continuance because of pretrial publicity. T.C.A. § 40-14-108 states that, '[a] continuance because of too great excitement to the prejudice of the defendant shall be in the sound discretion of the court." (ECF No. 12-19, at 22.) In affirming the trial court's decision denying the continuance, the Tennessee Court of Criminal Appeals relied upon the same provision, Tenn. Code Ann. § 40-14-108, to hold that a continuance "is not warranted unless an appellate court is convinced that the defendant did not have a fair trial and that a different result might reasonably have been reached if a continuance had been granted." (ECF No. 12-21, at 17.)

Likewise, Thomas argued on direct appeal that the trial court abused its discretion when it denied Thomas's request for a mistrial after the jury pool had allegedly been tainted by the statements of Verble Vickers, one of the members of the jury pool. (ECF No. 12-19, at 33–35.) The Tennessee Court of Criminal Appeals noted that a mistrial is warranted under state law "only if there is a manifest necessity for such action" and that the decision whether to declare a mistrial is within the sound discretion of the trial court. The court found no such abuse of discretion.

This Court has no authority to overrule the Tennessee Court of Criminal Appeals on issues of pure state law. Moreover, the state courts have never been granted a full and fair opportunity to consider the claims raised here as issues of constitutional dimension. *See Levine v. Torvik*, 986 F.2d 1506, 1516 (6th Cir. 1993) (holding that a petitioner "'fairly presents' his claim to the state courts by citing a provision of the Constitution, federal decisions using constitutional analysis, or state decisions employing constitutional analysis in similar fact patterns"), *cert. denied*, 509 U.S. 907 (1993). The claims are therefore procedurally defaulted.

Even if they were not, this Court would conclude that they are without merit. The evidence shows, as the state trial and appellate courts determined, that none of the jurors who heard Verble Vickers' comments was selected to serve on the petitioner's jury. Nor has Thomas pointed to any

evidence in the record supporting his contention that the jury pool was tainted by pretrial publicity. The trial judge asked each of the jurors who had been exposed to pretrial publicity a "series of questions regarding their ability to remain impartial if they were chosen to serve on the jury. . . . One of the questions . . . was whether the juror would be able to ignore preconceived notions about the case, set aside what they had read, and have an objective, open mind about the case." (ECF No. 12-21, at 17.) Thomas's trial counsel also had the opportunity to question all the potential jurors about their exposure to any pretrial publicity and whether such exposure might affect their view of the case. The judge dismissed those potential jurors who informed the court that they would have difficulty disregarding their prior knowledge of the case, and retained only those potential jurors whose responses to the questions satisfied her that they could remain open-minded. Consequently, Thomas has no factual support for his claim that his Sixth Amendment right to an impartial jury has been impaired. In fact, the Supreme Court has repeatedly rejected the notion that "juror exposure to . . . news accounts of the crime . . . presumptively deprives the defendant of due process." *Skilling v. United States*, --- U.S. ----, 130 S. Ct. 2896, 2914 (2010) (quoting *Murphy v. Florida*, 421 U.S. 794, 798–99 (1975)). Further, "juror *impartiality* . . . does not require *ignorance*." *Id.* (citing *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). The mere fact that the jurors were exposed to some pretrial publicity alone is insufficient to establish that a constitutional violation occurred, and Thomas has not shown that an error of constitutional magnitude occurred.

### 5. Claim 8

In Claim 8, Thomas contends that his trial counsel was ineffective for failing to object to the introduction of the victim's wedding rings into evidence as the fruit of an illegal search. In fact, Thomas's trial counsel did object to the introduction of the rings at trial. The rings were one of the subjects of a pretrial motion to suppress that was overruled by the trial court. The issue was presented again in the petitioner's direct appeal, and the Tennessee Court of Criminal Appeals affirmed the trial court's ruling. Clearly, trial counsel was not ineffective for failing to object to the introduction of the rings at trial, as he did object to their introduction.

### 6. Claim 9

In Claim 9, Thomas claims that his trial counsel erred in failing to call only one witness at trial. He argues that counsel "had three or four witnesses subpoenaed but called only one. . . . What effect this

had on the jury is unknown." (ECF No. 20, at 10.) He does not identify the witnesses he believes should have been called or what their testimony would have been. He does not indicate how this testimony might have changed the outcome in his case. This claim is procedurally defaulted, and Thomas has not shown cause for or prejudice resulting from his failure to raise the issue in the state courts. Moreover, because the claim as framed here is purely speculative, this Court cannot find that any error occurred at all, much less an error of constitutional dimension.

### 7. Claim 10

In Claim 10, Thomas argues that his trial counsel was ineffective for failing to research pertinent medical issues, and that if counsel had been better informed prior to cross-examining the state's medical expert, Dr. McMaster, the result of the trial might have been different. This claim was not raised below in any form and, like the others addressed above, it is procedurally defaulted.

Even if Thomas could show cause for his failure to raise this claim in the state court proceedings, he would be unable to demonstrate prejudice. The operative federal standard pertaining to ineffective-assistance claims is set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), which states that a defendant cannot prevail on an ineffective-assistance claim brought on direct appeal unless he shows that his counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. To prove this element, the defendant must first demonstrate that counsel's representation fell below an objective standard of reasonableness. *Id.* at 688. Second, the defendant must prove that he was prejudiced by his counsel's unprofessional errors; that is, that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Id.* The record does not in any way suggest that Thomas's trial counsel was functioning at a level below the objective standard of reasonableness. Moreover, although Thomas suggests that his counsel could have done a better job cross-examining Dr. McMaster, he has not actually shown how better preparation could have elicited testimony favorable to Thomas or that it could have had any effect on the outcome of the case.

### 8. Conclusion—Defaulted Claims

In sum, Johnson has not shown the cause and prejudice needed to excuse his procedural default as to any of these claims. He has therefore forfeited the right to federal review of these procedurally

defaulted claims.  *See Teague v. Lane*, 489 U.S. 288, 298–99 (1989) (denial of a claim is appropriate when the claim was not raised in the state appellate courts for review).  Regardless, even considered on the merits, none of the claims warrants habeas relief.

**B.      The Fully Exhausted Federal Claim**

*1.      Standard of Review*

Even when a petitioner's application for a writ of habeas corpus raises a federal constitutional claim that has been properly exhausted in the state courts, this Court's review of the state court's resolution of the issue remains quite limited.  The standard for reviewing applications for the writ of habeas corpus is set forth in 28 U.S.C. § 2254(d).  This section states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*Id.*  In other words, a federal court is bound by a state court's adjudication of a petitioner's claims unless the state court's decision was contrary to or involved an unreasonable application of clearly established federal law.  *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000); *Franklin v. Francis*, 144 F.3d 429, 433 (6th Cir. 1998).  Additionally, this court must presume the correctness of state court factual determinations, and the petitioner has the burden of rebutting that presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *see also Cremeans v. Chapleau*, 62 F.3d 167, 169 (6th Cir. 1995) ("We give complete deference to state court findings unless they are clearly erroneous."), *abrogated on other grounds by Thompson v. Keohane*, 516 U.S. 99, 111 (1995).

With these principles in mind, the court will examine the sole properly exhausted federal claim raised in Johnson's habeas petition, Claim 3.

*2.      Claim 3*

In Claim 3, Thomas argues that the victim's wedding rings were obtained pursuant to an illegal search.  Thomas's trial counsel argued on direct appeal that the rings should have been excluded as the fruit of an illegal search because "they were seized from Mr. Thomas[] without a voluntary, knowing and

intelligent waiver of his right to be secure in his person from unreasonable searches." (*See* ECF 12-19, at 18.)  The Tennessee Court of Criminal Appeals held that the trial court had not erred as a factual matter in concluding that Thomas had voluntarily surrendered the rings to Agent Krofssik, and that they were not the fruit of a search at all, much less a search in violation of Thomas's rights under the Fourth Amendment.  The record amply supports the state courts' conclusion, as a factual and legal matter, that Thomas voluntarily surrendered the rings.

More to the point, Thomas has not shown that the state appellate court's legal conclusion was contrary to clearly established federal law, or that its factual determination was unreasonable in light of the evidence presented in the state court proceedings.  The undisputed evidence is that Thomas took the rings out of his own pocket in response to a casual question by Agent Krofssik, so they were not discovered in the course of a "search" at all.   To the extent that Thomas is attempting to argue that the rings were taken in violation of his Sixth Amendment right to counsel, the Supreme Court has repeatedly held that the right to counsel guaranteed by the Sixth Amendment applies at the first appearance before a judicial officer at which a defendant is told of the formal accusation against him and restrictions are imposed on his liberty.  *Rothgery v. Gillespie County, Tex.*, 554 U.S. 191, 194 (2008) (citing *Brewer v. Williams*, 430 U.S. 387, 398–99 (1977); *Michigan v. Jackson*, 475 U.S. 625, 629, n.3 (1986)).  At the time Thomas turned the rings over to Agent Krofssik, he was not in custody or under arrest, so his Sixth Amendment right to counsel had not yet attached.  Thomas is not entitled to habeas relief on the basis of this claim.

IV.    **CONCLUSION**

The array of evidence presented at Arlie Ray Thomas's trial overwhelmingly supports his conviction for the premeditated murder of his wife.  The petitioner has no legitimate basis for arguing that he was the victim of any error of constitutional dimension, or that a failure to consider grant the relief sought will result in a fundamental miscarriage of justice.

Thomas's petition is entirely without merit.  The petition will therefore be denied and this matter dismissed.

The Court must issue or deny a certificate of appealability ("COA") when it enters a final order adverse to a § 2254 petitioner.  Rule 11, Rules Gov'g § 2254 Cases.  The petitioner may not take an

appeal unless a district or circuit judge issues a COA. 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1). A COA may issue only if the petitioner "has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the COA must "indicate which specific issue or issues satisfy the [required] showing . . . ." 28 U.S.C. § 2253(c)(3). A "substantial showing" is made when the petitioner demonstrates that "'reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were "adequate to deserve encouragement to proceed further."'" *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). "[A] COA does not require a showing that the appeal will succeed." *Miller-El*, 537 U.S. at 337. Courts should not issue a COA as a matter of course. *Id.*

In this case, there can be no question that the petition fails to state any basis for federal habeas relief. Because any appeal by the petitioner on the issues raised in this petition does not deserve attention, the Court will deny a certificate of appealability.

Further, Rule 24(a)(3) of the Federal Rule of Appellate Procedure provides that a party who was permitted to proceed *in forma pauperis* in the district court may proceed on appeal *in forma pauperis* unless the district court certifies that an appeal would not be taken in good faith or otherwise denies leave to appeal *in forma pauperis*. For the same reasons the Court will deny a certificate of appealability, the Court will certify that any appeal would not be taken in good faith.

An appropriate order will enter.

Kevin H. Sharp
United States District Judge